FIFTH DIVISION
April 14, 2006

No. 1-05-1737

| | | |
|---|---|---|
| ROSE L. MANNING, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| THE DEPARTMENT OF EMPLOYMENT | ) | |
| SECURITY, an Administrative Agency; | ) | |
| BRENDA RUSSELL, Director of the | ) | |
| Illinois Department of Employment Security; | ) | |
| BOARD OF REVIEW OF THE ILLINOIS | ) | |
| DEPARTMENT OF EMPLOYMENT | ) | |
| SECURITY, an Administrative Agency; | ) | |
| and, DRS. MORAN & MORAN, S.C., | ) | |
| an Illinois Corporation and Employer, | ) | Honorable |
| | ) | Alexander P. White, |
| Defendants-Appellees. | ) | Judge Presiding. |

PRESIDING JUSTICE GALLAGHER delivered the opinion of the court:

Plaintiff, Rose Manning, appeals from an order of the trial court affirming the decision of the Board of Review of the Illinois Department of Employment Security (Board), which denied plaintiff's claim for unemployment insurance benefits. On appeal plaintiff contends that the Board erred in finding that she was discharged for misconduct involving a hostile voice-mail message to her coworker. We affirm.

Plaintiff was employed by Drs. Moran & Moran, S.C., as a medical assistant from October 7, 1998, to May 18, 2004, when she was discharged for leaving a hostile, intimidating and vulgar message on a coworker's home voice-mail. Subsequently, plaintiff sought unemployment insurance and a claims adjudicator denied her

unemployment benefits noting that plaintiff was discharged because of "unprofessional conduct." Plaintiff filed an application for reconsideration of the claims adjudicator's determination, and the claims adjudicator denied the application. Plaintiff appealed to the Illinois Department of Employment Security (Department).

A referee for the Department held a telephone hearing at which plaintiff and Dr. Michael Milani, who identified himself as a physician and also "one of the employers," testified that he became aware of plaintiff's misconduct because "[t]he other employees [*sic*] that received the phone call brought to the attention of *** one of the *** nurses and then the office manager who brought it to the physician's attention."

Milani testified that he met plaintiff on May 14, 2004, to question her about the incident. Plaintiff told Milani that she relied on a coworker Tiffany Swanson to drive her to work because she had lost her driver's license. She stated that on May 13, 2004, Swanson left work without plaintiff in order to pick up her child. Later that night, plaintiff called Swanson. An excerpt from plaintiff's message to Swanson was played during the hearing.

"(inaudible) fucking word. That was very uncalled for and it is very fucking childish for you to fuck off. Yes, (inaudible) and you are the (inaudible) and (inaudible) and I have been trying every goddamn thing I can to try to get you and me to work on time. I changed my schedule. I (inaudible) telling fucking George every day. I have to put up with those fucking bitches in the back there, telling me what to fuck to do and you telling me what to do, everybody

fucking telling me what do to [*sic*].  Nobody gives me any

fucking consideration here.  I have been trying everything I

can to try to keep you (inaudible)..."

Milani stated that, after hearing the message, he felt that the message was hostile, intimidating and vulgar, and that this kind of language was not permissible in the work place.  Milani testified that the message had been taken off of Swanson's personal cell phone voice-mail and that he was not sure whether Swanson was working when the message was sent.

Milani further testified that Dr. George Moran, one of the employers at the office, prepared two letters regarding the incident, one dated May 13, 2004 and one dated May 14, 2004.  The May 13 letter reported that plaintiff was "slamming exam room doors and swearing under her breath" because she was upset that Swanson could not wait to give her a ride home.

The May 14 letter reported that Swanson had complained about an "intimidating" phone call left on her home answering service by plaintiff and that Swanson shared this message with the office manager.  Plaintiff claimed that the message was in response to being left stranded at work as well as receiving many inflammatory phone calls at home from Swanson.  The letter further stated that office management told plaintiff that the message was interpreted as       mean-spirited and instrumental in creating workplace hostility.  Milani testified that Swanson was warned about her conduct as well, but that she still worked at the firm.  When asked whether he had ever given plaintiff a warning about leaving emotional messages on people's voice-mail, Milani

responded "I think it is just kind of assumed that there is no violence tolerated in the work place." On May 18, 2004, plaintiff was discharged for making a "hostile and intimidating and vulgar phone call" to one of the other employees.

Plaintiff testified that she was given a letter stating that the office manager had warned her about slamming a door and saying "swear words" under her breath as a reason for discharge. She denied slamming doors or cursing under her breath. Plaintiff admitted that on May 13, she left a message for Swanson and explained that Swanson had called her five times that evening. Swanson first called "saying vulgar, dirty bad words to [her]." Plaintiff stated that, after she hung up, Swanson continued calling her but she did not "answer her back." When plaintiff did not answer, Swanson left a five-minute message calling plaintiff "every name." Plaintiff did not save any of Swanson's messages. Plaintiff testified that she waited and then called Swanson and left the message.

Plaintiff further testified that no one at her employer's office ever warned her about leaving emotional messages on someone's personal voice-mail. She stated that her work performance was "excellent" and that she had never been "written up" for anything.

Following the telephone hearing, the referee affirmed the claims adjudicator's determination that plaintiff was ineligible for unemployment benefits due to misconduct. The referee found that: (1) plaintiff had relied upon Swanson for transportation to work; (2) on May 13, 2004, Swanson left plaintiff stranded at work; (3) plaintiff became upset, cursing under her breath and slamming doors and she was asked to refrain from this

conduct; (4) later that evening, Swanson telephoned plaintiff several times and, according to plaintiff, left several insulting messages; (5) in response, plaintiff telephoned Swanson and left a "vulgar message." The referee concluded that "the testimony of record established that the [plaintiff] knew or should reasonably have known that the message she left for her coworker constitute[d] a willful and deliberate disregard of the employer's polices."

Plaintiff appealed to the Board, which affirmed the referee's decision. The Board found that the referee's decision was supported by the record and the law and incorporated it as part of its decision. On administrative review, the trial court affirmed the decision of the Board, finding that it is "not against the manifest weight of the evidence nor *** contrary to law."

On appeal, plaintiff contends that her voice-mail message to Swanson did not constitute misconduct because it did not harm the employer or other employees and she did not receive prior warnings.

Initially, we must first determine the applicable standard of review. Plaintiff argues that the Board's determination that plaintiff's voice-mail message to Swanson constituted misconduct is a legal conclusion and must be reviewed *de novo*. The Department contends that the Board's determination constituted a mixed question of law and fact and should not be reversed unless it is clearly erroneous. We agree with the Department.

In a case involving a claim for unemployment benefits, the Board is the trier of fact and we must defer to its factual findings unless they are against the manifest weight of evidence. Jenkins v. Department of Employment Security, 346 Ill. App. 3d 408, 412 (2004); Horton v. Department of Employment Security, 335 Ill. App. 3d 537, 540 (2002). When only a legal question is involved, the standard of review is *de novo.* Wrobel v. Department of Employment Security, 344 Ill. App. 3d 533, 536 (2003). However, when, as here, the issue on appeal involves a mixed question of law and fact, deference will be given to the agency's decision and we will only reverse when the Board's decision is "clearly erroneous." AFM Messenger Service, Inc. v. Department of Employment Security, 198 Ill. 2d 380, 395 (2001); Horton, 335 Ill. App. 3d at 540-41. A mixed question of law and fact is one that involves an examination of the legal effect of a given set of facts. AFM Messenger Service, 198 Ill. 2d at 391.

Here, we are presented with numerous questions that require application of certain facts to determine their legal effect. For example, we must determine whether the alleged conduct harmed the employer and whether a reasonable rule against the alleged conduct can be inferred. Therefore, we will apply a "clearly erroneous" standard. Having addressed the appropriate standard of review, we now turn to the merits of plaintiff's claims.

The Unemployment Insurance Act (Act) (820 ILCS 405/100 et seq (West 2004)) was enacted to provide economic relief to individuals who become involuntarily unemployed. AFM, 198 Ill. 2d at 396; Jenkins, 346 Ill. App. 3d at 411. However, the

individual claiming unemployment insurance benefits has the burden of establishing her eligibility.  Jenkins, 346 Ill. App. 3d at 411.

Individuals who are "discharged for misconduct" are ineligible to receive unemployment benefits under the Act.  820 ILCS 405/602(A) (West 2004); Arroyo v. Doherty, 296 Ill. App. 3d 839, 844 (1998).  Three elements must be proven to establish misconduct under the Act: (1) that there was a "deliberate and willful violation" of a rule or policy; (2) that the rule or policy of the employing unit was reasonable; and (3) that the violation either has harmed the employer or was repeated by the employee despite previous warnings.  820 ILCS 405/602(A) (West 2004); Arroyo, 296 Ill. App. 3d at 845.

In determining whether an employer was harmed, the employee's conduct should be viewed in the context of potential harm, and not in the context of actual harm. Greenlaw v. Department of Employment Security, 299 Ill. App. 3d 446, 448 (1998). Additionally, an employer is not required to prove the existence of a reasonable rule by direct evidence, and a court may find the existence of a reasonable rule "by a commonsense realization that certain conduct intentionally and substantially disregards an employer's interests."  Greenlaw, 299 Ill. App. 3d at 448.  Standards of behavior that an employer has a right to expect constitute a reasonable rule or policy.  Bandemer v. Department of Employment Security, 204 Ill. App. 3d 192, 195 (1990).  Such a rule or policy does not need to be written or otherwise formalized.  Caterpillar, Inc. v. Department of Employment Security, 313 Ill. App. 3d 645, 654 (2000).

In the present case, although the voice-mail message to Swanson may not have directly harmed the employer, it was potentially harmful to its interests because the use

of hostile and intimidating language to a coworker could adversely affect the work environment. See Greenlaw, 299 Ill. App. 3d at 448. The evidence at the Department's phone hearing established that on May 13, 2004, prior to leaving the voice-mail, plaintiff became upset at work because Swanson left her stranded and she began cursing under her breath and slamming doors. Later that day, plaintiff left a message on the personal voice-mail of Swanson. In this message, plaintiff repeatedly used abusive language and stated that she was angry toward Swanson and other nurses at the office. Milani testified that he thought the message was hostile, intimidating and vulgar and that his office did not permit the type of language used in plaintiff's message.

Although it appears that the vulgar message was left on Swanson's voice-mail after business hours, the incident from which it arose began at work and included the disruption of slamming doors and swearing. Additionally, several profane comments in the message related to coworkers and the work environment. Clearly this incident had the potential to affect employee morale and cooperation and ultimately harm the employer. See Greenlaw, 299 Ill. App. 3d at 448.

Moreover, although there was no written policy concerning the use of abusive language towards coworkers, commonsense implies that the use of hostile, intimidating and vulgar language "intentionally and substantially disregards an employer's interests." Greenlaw, 299 Ill. App. 3d at 448-49 (holding that the plaintiff violated the standard of behavior an employer has a right to expect where the plaintiff told her supervisor to " 'kiss my grits' "). Furthermore, misconduct may be found even if the abusive conduct occurred off work premises. See Caterpillar, 313 Ill. App. 3d at 654 (holding that

"common sense implies the existence of a policy against employees continually making unwanted contact with a coworker at work and outside of work regarding their romantic relationship"). Therefore, under the facts as presented, we cannot say that the Board was clearly erroneous in determining that plaintiff violated a reasonable rule. See Bandemer, 204 Ill. App. 3d at 195.

Plaintiff maintains that Caterpillar, 313 Ill. App. 3d at 654, where the plaintiff made unwanted contact with a coworker both at work and outside work, and Greenlaw, 299 Ill. App. 3d at 448-49, where the plaintiff told her supervisor to "kiss my grits" at work, are distinguishable from the case at bar. While we agree that there are some factual differences between those cases and the present case, we base our decision on the rationale of these cases which held that a plaintiff may be discharged if she violates a standard of behavior an employer has a right to expect.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'MARA FROSSARD and NEVILLE, JJ., concur.